Thank you. Good afternoon. Please be seated. Next case is in the Marriage of Bracken. That's case number 4170210. For the appellant, Candace Thomason and for the appellant, Brian Seckler. You may proceed. May it please the court, counsel. My name is Candace Thomason. I'm here on behalf of the appellant, Jeremy Bracken, on an appeal from a Woodford County dissolution marriage case. There are two issues that are up on appeal. The first issue is that of whether the court inappropriately denied maintenance to Jeremy Bracken. The second issue is whether the court inappropriately denied a reimbursement for Jeremy Bracken's non-marital proceeds from his non-marital house that were used to build an outbuilding on the party's marital property. Your Honors, we are asking the court to reverse the trial court's decision and grant a word of maintenance to Jeremy Bracken in the sum of $32,467.90 over the course of 10 months. Further, we are asking the court to reverse the decision denying a reimbursement for his non-marital contribution and award him the sum of $51,000 for his contribution to the building of the outbuilding on the marital property. Your Honor, if you look at the facts just on his face, one party is earning $165,973 per year. The other party is earning $45,713 per year. It sounds and seems like a maintenance case. However, the trial court denied maintenance. When the legislator enacted Section 504, it included statutory calculations to make it so that no matter what county you went in in the state of Illinois, no matter who the judge was, who the attorneys were, two parties walked in, they would get the same outcome. It was to apply some type of consistency to the maintenance awards that were occurring, no matter the gender or any other facts except for the party's income. And if we look at just the numbers, in this case, it would be a maintenance even though the parties were married for only 49 months. The legislator included awards of maintenance for marriages of less than five years. If it had intended for the trial court to just deny maintenance simply on the fact that the parties were only married for a short term, the legislator would have never allowed for a duration of maintenance for zero to five. It accounted for the fact that the parties were married for a short term. The law permits an order of maintenance for short marriages. You obviously have done some research on this. I have not researched it, but I literally do not recall a single case going on 29 years in this court where I've seen maintenance ordered for a marriage of less than five years. Are you aware of any? Are you aware of any before the change in the law? Well, doesn't the fact that you're not aware of any case where maintenance was ordered for a marriage of less than five years counsel against arguing that the trial judge denied maintenance in this case solely on the grounds of gender bias? I think that's one factor, but I think that the fact that the legislator then purposely put a duration for less than five years, that changed it. And it changed the way we looked at maintenance when that formula was placed into the statute. So the fact that no laws have been or no cases have happened since that duration of less than five years had been placed in there, and I think the legislator's intent was to account for those cases where parties were married less than five years. If the legislator never wanted to do that and just wanted to follow the case law and say marriage is less than five years, no maintenance, it would have never included the duration. Well, counsel, it's not my point. I said the statute permits it, but it doesn't say anything about it being exceptional. And the fact that I, in my own experience, have had cases where it occurs, suggests it's exceptional. And going back to my other line, I always think umbrage when trial judges are attacked for reasons that have nothing to do on their face with their decision. But like gender bias, or this morning we had an argument that the judge engaged in vindictive sentencing, absent anything in the record for that either. I'm just wondering, especially given this situation where it's such an exceptional case, how you justify making this kind of claim, which is, after all, a claim that the judge engaged in an improper characterization of this evidence or rendered the decision it did, the court did, based on an improper factor. Your Honor, I don't think that that is the only reason that the maintenance denial was improper. I didn't suggest it would be the only reason. I'm suggesting why are you arguing that it's any reason, in the absence of anything in this record, to show it? And back in the day, I could imagine the judge saying, well, what are you talking about? This is some guy. Guys don't get maintenance. That would be some evidence to support it. Do we have anything like that in this case? No, Your Honor. I do think that there is an inference when there's such a drastic thing that that could be, in fact, that there could have been some gender bias. Now, I think that under the other factors in Section 504, before you even get to the equation, those factors do weigh in favor of a maintenance award with the difference in, the drastic difference in the party's incomes, one party owning four times as much as the other party. Also, the parties had a standard of living where they had a combined income of $187,000 combined with a household, a house that sold for $327,000 and with a mortgage of $225,000. That's not something that one party could establish based off of an income of $45,000. That's not a standard of living that Mr. Bracken could maintain. Further, the assets that he did keep in divorce were not income producing beyond the $45,000 that were accounted for in the statute. I also think that it does have some deference of where does the law draw the line is. If we're just going to say that one of the factors is a duration of maintenance and it's a short factor, then why then have another, I guess, application where the court could award maintenance and have a formula for it? It seems almost contradictory to say we can rest our hat on it's just a short-term marriage, but then here's what to do when there is a short-term marriage and what to award. I think in cases where there's such a drastic disparity in the party's incomes, that's when maintenance is appropriate. Even if it is for a short duration, it is enough to get the other party back on a level playing field, back into where they can support themselves, which is the policy behind maintenance, is to help the lesser earning spouse maintain a standard of living and get back to a position now that instead of one household, they're two households. And in speaking of the house that sold for $327,000, that drastic increase, the parties purchased the house for $263,500 in 2013. The drastic increase in the sale price was part and due to the building of this outbuilding, a building that was built separately and we were able to clearly trace at the trial court the funds from Mr. Bracken's non-marital residence to his bank account, to all of the subcontractors, to all the parts that went to go build this building. Mr. Bracken wasn't even involved in it and we were able to. These funds never lost their identity. They are now just in the form of an outbuilding that happened to be on their marital residence. It's separate. How did they hold title to the marital residence? How did they, Your Honor? It was in joint tenancy. Well, so you put an improvement on joint tenancy property. It becomes part of the joint tenancy, doesn't it? I mean, that's just simple real estate law. Right, and Your Honor, I understand that. I think, though, that doesn't mean that the gift presumption wasn't overcame. I think the gift presumption can be overcame and it was overcame in this case. So just because, even if it arises that it became affixed and this outbuilding is on the marital property and it's joint tenancy and it's transmuted and commingled, it doesn't mean that the gift presumption wasn't overcame in this case. The case law shows that when people- Well, there are lots of cases, aren't there, where property is placed into a joint tenancy that demonstrates donative intent. And that isn't exactly what happened here, but kind of. He took the money and put it into a building on the marital property that was held in joint tenancy. Thus, he, in essence, put the money into the joint tenancy. I think the difference in the cases that do say that it's a donative intent and a gift and the cases that say the gift presumption were overcome is how the parties lived their financial lives. And these two parties in the maintenance and in the ruling on the non-marital reimbursement, the trial court noted these parties lived more as roommates. They were financially separate. They kept different bank accounts. They each paid the same bills, but they paid different through their individual bank accounts. So two parties who lived financial separate lives like roommates. You wouldn't expect your roommate to gift $51,000 onto your property. You would expect that they would want it back. I think there's an implicit agreement when you keep such hard lines of what's mine and what's yours, even in a marriage. I think there's some expectation that if I put $51,000, a large amount of money, I'm going to expect it back. It's a little different than if I put $51,000 inside the actual marital residence. He didn't pay down the mortgage. He didn't improve inside the marital residence. It was actually a separate building for his non-marital business to store the equipment of it. It was separate from the actual household. It happened to be on the line as well. But I do think there is an exception in In Re Marriage of Didier to the fixture law, where once a house is built on the land, it becomes affixed in front of the property. The exception says if you build a fixture with the consent of another person on their land, then that building is still yours, but the land is still the other person's. If you look at the non-marital estate and the marital estate as almost two separate entities, which divorce law does look at them as two separate entities and two separate estates, you can say his non-marital estate built that outbuilding on the marital property with the marital property's consent, but it's still his non-marital property, even though it's attached to land. When they sold this house, he should be entitled to a reimbursement, especially when he clearly traced every cent at the trial level with every receipt, every contractor, and it was used separately. Mrs. Bracken had nothing to do with that. Did the outbuilding increase the ultimate value of the property as a whole? Your Honor, I think there is no specific evidence that's showing that, but the parties did purchase the house. Wouldn't you need that? I think the fact that parties purchased the house in 2013 for $263,500 and then it increased $64,000 in a matter of three years would kind of be indicative that the only improvement they really made was adding an outbuilding. Property doesn't just drastically increase that far in a rural area of Woodford County. I think that would show that this outbuilding did impact it, but I don't think the impact on the value has to deal with a reimbursement. It would if we wanted a larger portion of the distribution of marital estate and equivalent. The court could find, and we do argue in our alternative, that if transmutation does occur and it's a marital property, that because of his larger contribution and because there has been an increase in the value of the property, the trial court could have awarded a larger portion of the marital proceeds to Mr. Bracken for that contribution of $51,000. It's just a little coincidental that $51,000 increased by $64,000 in a matter of three years when they sold the property. If there's no further questions, I'd like to reserve my time for rebuttal. Okay. Thank you. You'll have rebuttal. And Mr. Sackler. Good afternoon. I'm Brian Sackler. May it please the Court, I represent the appellee, Cherie Bracken. The first issue I would like to address is the trial court's denial of maintenance. Mr. Bracken focuses on the statutory duration of the marriage in his argument throughout his brief, but before we get to either the statutory amount or the statutory duration, the legislature has given the trial court 14 different factors it should consider before it decides if the statutory guidelines should apply. The trial court in this case considered each and every one of those factors. In its ruling, it did focus on the duration, the rather short duration of approximately four years. It focused on the needs of the parties. There was no evidence that Mr. Bracken presented a shortfall. In fact, Mr. Bracken purchased a different vehicle weeks after the parties separated with no contribution from Mrs. Bracken. It focused on the lifestyle established during the marriage. There was one vacation that Mrs. Bracken paid for when she got her dream job, earning approximately $100,000 a year. The parties evenly divided all of their marital obligations throughout the marriage. The parties did have a $327,000 home, and neither party could afford to maintain such a home after the dissolution of the marriage. The court specifically considered the time necessary for the party seeking marriage to obtain education. Mr. Bracken made an argument that he needed additional time to seek an education. He, after the parties separated, signed up for two classes and ended up having to drop one of them while working basically a part-time job. The trial court considered the marital estate and the non-marital estate. Mrs. Bracken's non-marital estate consisted of $31,776.69 in debt, while Mr. Bracken's non-marital estate consisted of $46,888.25 without including the value of his non-marital business. The court also considered contributions by Mr. Bracken to Mrs. Bracken's education. Mrs. Bracken did complete a master's degree during the party's marriage, which she paid for with her GI bill, student loans she assumed, and maintained a full-time job while contributing towards one-half of all marital expenses. The parties even divided the cost of their honeymoon. This was clearly not a maintenance case. The trial court was not biased at all in determining that this was not a maintenance case. Gender never played a part in the trial court's decision. There were no comments made. There was virtually no evidence of any sort of bias, and we would respectfully disagree that the trial court was biased at all. Turning to the $51,000 non-marital contribution to the marital estate. The standard of review is against the manifest weight of the evidence, and in order to overcome the presumption of a gift to the marital estate, parties need to show clear, convincing, and unmistakable evidence. The only evidence of an increase in value that was presented was the costs associated with constructing the outbuilding. The marital home was purchased with no money down because of Mrs. Bracken's Veterans Affairs loan. Three months after the parties purchased the home, which was purchased as a tenancy by the entirety, Mr. Bracken used the proceeds from his non-marital home to build an outbuilding. This is similar to using the proceeds from the non-marital home to remodel a kitchen. It's attached to the land. It goes with the land. The building and structures became part of the land. At no point in time did the parties partition any of the property. It was sold as a whole. Interestingly, Mr. Bracken had at least four opportunities to let Mrs. Bracken know that he expected this money to be returned to him. He could have let her know when he originally built the building. He could have let her know when the parties were discussing a ten-year plan to relocate and sell the marital residence. He didn't bring it up then. Testimony at trial pointed out that the parties had discussed moving to Dallas, Texas for Mr. Bracken's career. He had an opportunity then to say, hey, I put this $51,000 in. I want the $51,000 back. Never did it. At the beginning of the dissolution of marriage case, Mr. Bracken was served with interrogatories. One of those interrogatories asked, please list your non-marital property. He never listed it. That was the fourth opportunity that he had to bring it up. It wasn't until a few weeks before trial that Mr. Bracken said, oh, by the way, I'd like this $51,000 back. At trial, Mr. Bracken was asked on cross, why didn't you ask for this money back? And his response was, because we were married and I assumed we would stay married. If that is not clear, convincing and unmistakable evidence that this was a gift to the marital estate, it would be hard to find better evidence. Maybe it was a contingent gift. A contingent gift upon the marriage. Lasting. Lasting. Well, he never mentioned that either throughout any of it. Throughout the marriage, throughout the divorce proceedings, it was literally on the eve of trial that this came up. Now, Mr. Bracken relies on several different cases to support his position that he should get this money back, and I would urge this court not to follow those precedents because they are not precedential. In re the marriage is sealed. There was no presumption of a gift to the marital estate. The funds were held in the account of one of the parties. They were separate. The account was used as a mere conduit. In re the marriage of Hinky, no presumption arose because the buildings constructed in that were constructed on the husband's non-marital estate. There was no transfer into joint tenancy or a tenancy body in entirety as happened here. In the First District's decision in Wojcicki, the contributions were in money and labor over a long marriage, and that outweighed the presumption of a gift. Mr. Bracken has argued that he should be entitled, if this court is not going to grant him the $51,000 back, that he should be entitled to a disproportionate division of the marital estate. Well, he's already received a disproportionate division of the marital estate. He did that by agreement. The parties stipulated to a number of exhibits, one of which was a proposed division of the marital estate, which the trial court granted as the parties' agreement with the exception of the $51,000 that was standing out there on this non-marital contribution. Mrs. Bracken took all of her student loans, even the marital portion of her student loans. In the division of the marital estate, the spreadsheet merely said, Mr. Bracken receiving a much larger share of the marital estate. When it came time to sell this house, Mrs. Bracken agreed to give Mr. Bracken an additional $2,500 in order to get the sale completed in a timely manner. He's gotten everything that he asked for, and to say that the $51,000 wasn't a gift to the marital estate when he never mentioned that he expected any reimbursement for it is befuddling. The court asked if there was any evidence of an increase in value. No evidence was presented at the trial court that the marital residence increased in value as a result of this outfilling. No partition was made of the outbuilding. The property could have been easily divided, and if Mr. Bracken wanted to keep it to run a business or whatever out of the building, he could have done that. He didn't. There was evidence at trial that the building was not the only improvement made on the marital residence. In fact, Mrs. Bracken contributed $7,000 of her non-marital money towards improvements on the home, and the trial court properly determined that those were gifts to the marital estate. She never communicated her intent. The First District in the Vondra case is analogous to that. In Vondra, non-marital funds were used to pay down a marital mortgage. At the trial, the only evidence presented was testimony that the party who contributed the funds had no intention of a gift. That was it. The trial court properly considered all of the evidence. He weighed the testimony. He was in the best position to weigh the testimony of the parties and determined this was clearly a gift. Now, counsel has argued that because the parties kept their finances separate, that that cuts against this. Well, I would argue that the exact opposite is true. If the parties were so intent on keeping their finances separate, which they were, then how do you not say, I want this money back? I mean, when they literally split the cost of their honeymoon, you would think that if this was intended to come back, Mr. Bracken would have said something towards that end. He didn't. If there are no questions from the court, I will rest on the brief. I don't see any. Thank you. Any rebuttal? Your Honor, to place an expectation on a married couple to discuss reimbursements in the case of a dissolution of marriage is unreasonable. I don't think the court intended, it would almost be saying, like, we want everyone to get a prenuptial agreement. And short of a written agreement, you're not going to really be able to overcome that gift presumption. Yet there are cases where that gift presumption was overcame by the party's actions and by the parties living separately and by the parties maintaining control over the building or the property that they bought. Placing, expecting people to discuss this and for a lay person to know, if I put $51,000 of my money that I had before, that I have to then tell my wife, I want that back for sure. If we get divorced, I don't think that's the intention of the reimbursement. The statute under 503 clearly states and lays out that if they're commingled, and you can clearly trace it, that the non-marital estate or the marital estate would be entitled to a reimbursement. And all the presumptions, including a gift, are rebuttable by clear and convincing evidence. The division, and in regard to the division and unequal distribution that the parties agreed to, this division doesn't equate to the substantial amount of money that was used of Mr. Bracken's non-marital funds. It equates to a debt, which if it was included, it would have been about $11,000 that would have been his share. And it also equates to a business that was producing the income of the $45,000. It doesn't match up to the non-marital contribution that he put in. Further, the case of in-rate marriage of Vondra is also distinguishable. In Vondra, she used her inheritance to pay down a mortgage, a mortgage that was also paid using marital funds. Here, the money that was used was to build an outbuilding. It was completely separate. And if you use the case of in-rate of the marriage of Didier and the argument that since his non-marital estate built it on the marital estate, it would not become a fixture and it wouldn't be transmutated into marital property. Further, in regard to the statutory factors regarding maintenance, I think if you look at one of the factors is the parties' incomes. There's a big discrepancy in these parties' incomes. She earns nearly four times as much as he does. The next one is the standard of living. These parties lived in a household and had a combined gross income of $187,000 a year. And only $45,000 was his. Further, I think in 49 months, going two trips out of the country is a lavish lifestyle. And although the parties divided their expenses, that doesn't mean he was able to pay all the expenses without her contribution. And in fact, even after the dissolution was filed and she moved out of the house, she continued to pay the mortgage. She continued to have to pay those household bills so the house could be sold because his income alone wasn't going to cut it. We ask that if you're going to consider the parties' souls living such financial separate lives, that you also consider that why would two people living separate financial lives as roommates, why would they ever gift $51,000 to the other party? It just simply doesn't make sense. Thank you. Okay. Thanks to both of you. The case is submitted and court stands in recess.